******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# STATE OF CONNECTICUT *v.* MANUEL MORAN
## (AC 47630)

Alvord, Clark and Keller, Js.

*Syllabus*

Convicted, following a jury trial, of the crime of manslaughter in the second degree, the defendant appealed to this court. The victim, who suffered from heart disease and chronic asthma, had a heart attack and stopped breathing after the defendant put him in a headlock and prevented the victim from using an asthma inhaler. The defendant claimed, inter alia, that the evidence was insufficient for the jury to find that his conduct was the proximate cause of the victim's death. *Held*:

The evidence was sufficient for the jury to find beyond a reasonable doubt that the defendant's conduct was the proximate cause of the victim's death, as there was ample evidence in the record to support the jury's finding that the defendant's attack on the victim substantially and materially contributed to the victim's death.

The defendant did not implicitly waive his claim that the trial court improperly instructed the jury regarding the victim's preexisting medical conditions pursuant to *State* v. *Kitchens* (299 Conn. 447), as nothing in the record indicated that defense counsel affirmatively accepted the preexisting medical condition jury instruction but, rather, defense counsel's statement in response to the prosecutor's argument appeared to be an acknowledgment of the prosecutor's position, rather than affirmative acceptance of the preexisting medical condition instruction.

The trial court did not err in instructing the jury regarding the victim's preexisting medical conditions, as the court's instruction was an accurate statement of the law that was properly tailored to the issues in the case and sufficient for the guidance of the jury.

Argued January 14—officially released July 7, 2026

*Procedural History*

Information charging the defendant with the crimes of felony murder, robbery in the first degree, and manslaughter in the second degree, brought to the Superior Court in the judicial district of Hartford, geographical area number fourteen, and tried to the jury before *Droney, J.*; verdict and judgment of guilty of manslaughter in the second degree; thereafter, the state entered a nolle prosequi as to the felony murder charge; subsequently, the court granted the defendant's motion to

dismiss the felony murder charge, and the defendant appealed to this court. *Affirmed*.

*Kevin M. Black, Jr.*, assigned counsel, for the appellant (defendant).

*Timothy J. Sugrue*, assistant state's attorney, with whom, on the brief, were *Sharmese L. Walcott*, state's attorney, *Robin Krawczyk*, former senior assistant state's attorney, and *Ashley Thorpe*, assistant state's attorney, for the appellee (state).

*Opinion*

CLARK, J. The defendant, Manuel Moran, appeals from the judgment of conviction, rendered after a jury trial, of manslaughter in the second degree in violation of General Statutes § 53a-56 (a) (1). The defendant claims that (1) the evidence was insufficient for the jury to find that his conduct was the proximate cause of the death of the victim, Julio Ruiz, and (2) the trial court improperly instructed the jury as to the element of proximate cause. We disagree and, accordingly, affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to this appeal. The defendant and the victim were both patients of the Root Center for Advanced Recovery (Root Center), a methadone clinic in Hartford. It was well known among patients at the Root Center that the victim suffered from health issues that affected his breathing. In addition to taking methadone, the defendant also used heroin on a daily basis, which he would occasionally buy from the victim.

On the morning of August 19, 2019, Christine Ouellette, who knew both the defendant and the victim, received a dose of methadone from the Root Center and then waited outside for the victim. The defendant approached Ouellette and asked if she had seen the victim. Ouellette told the defendant that the victim had not arrived yet that morning and the defendant walked away.

When the victim arrived later that morning, he and Ouellette spoke while they walked toward the Root Center. Ouellette saw the defendant approaching and told the victim that the defendant had been looking for him earlier that morning. The defendant put his arm around the victim's neck and started leading him away from Ouellette as he engaged the victim in a heated conversation. The defendant then put the victim in a headlock and started pulling his head toward the ground. The victim started gasping for air and reached for an asthma inhaler from his pocket, but the defendant knocked the inhaler out of the victim's hand, stomped on it, and kicked it away. The defendant then pulled out a knife and threatened the victim with it, took a bag that the victim was wearing around his chest, and ran off.

Ouellette ran inside the Root Center to get help. Sherrene Laing and Curtis Foster, both nurses at the Root Center, went outside and found the victim hunched over a railing, unresponsive and not breathing. Laing and Foster lowered the victim to the ground and administered cardiopulmonary resuscitation. A bystander called 911 and reported that the victim had suffered an overdose, but Lauren Manuel, another patient of the Root Center, interrupted the caller and told the 911 operator that the victim had been robbed at knifepoint. Emergency medical service personnel arrived and transported the victim to Hartford Hospital, where he was placed on a ventilator. The victim never regained consciousness and died on September 5, 2019.

The defendant was charged with one count of felony murder in violation of General Statutes § 53a-54c,[1] one count of robbery in the first degree in violation of General Statutes § 53a-134 (a) (3),[2] and one count of manslaughter

---

[1] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, such person commits or attempts to commit robbery . . . and, in the course of and in furtherance of such [robbery] or of flight therefrom, such person . . . causes the death of a person . . . ."

[2] General Statutes § 53a-134 provides in relevant part: "(a) A person is guilty of robbery in the first degree when, in the course of the commission

in the second degree in violation of § 53a-56 (a) (1).[3] On November 2, 2023, the jury found the defendant not guilty of robbery in the first degree and guilty of manslaughter in the second degree. The jury was unable to reach a verdict as to felony murder and the court declared a mistrial as to that charge. On January 17, 2024, the court, *Droney, J.*, sentenced the defendant to eight years of incarceration followed by two years of special parole.[4] This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the evidence was insufficient for the jury to find beyond a reasonable doubt that his conduct was the proximate cause of the victim's death, as required to support his conviction of manslaughter in the second degree. We disagree.

"In reviewing the sufficiency of the evidence to support a criminal conviction we apply a [two part] test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt. . . .

"We note that the jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or

of the crime of robbery as defined in section 53a-133 or of immediate flight therefrom, he . . . (3) uses or threatens the use of a dangerous instrument . . . ."

[3]General Statutes § 53a-56 provides in relevant part: "(a) A person is guilty of manslaughter in the second degree when . . . (1) [h]e recklessly causes the death of another person . . . ."

[4]On the same date, the state entered a nolle prosequi as to the felony murder charge. The defendant then moved to dismiss that charge, which the court granted without objection.

an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . [Rather][t]he [jury] may draw whatever inferences from the evidence or facts established by the evidence it deems to be reasonable and logical. . . .

"Finally, [a]s we have often noted, proof beyond a reasonable doubt does not mean proof beyond all possible doubt . . . nor does proof beyond a reasonable doubt require acceptance of every hypothesis of innocence posed by the defendant that, had it been found credible by the [finder of fact], would have resulted in an acquittal. . . . On appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the [jury's] verdict of guilty." (Internal quotation marks omitted.) *State* v. *Jones*, 210 Conn. App. 249, 267–68, 269 A.3d 870, cert. denied, 343 Conn. 901, 272 A.3d 199 (2022).

To find the defendant guilty of manslaughter in the second degree pursuant to § 53a-56 (a) (1), the jury was required to find beyond a reasonable doubt that the defendant (1) acted recklessly, and (2) caused the death of the victim in doing so. *State* v. *Grant,* 103 Conn. App. 456, 460–61, 928 A.2d 1247, cert. denied, 284 Conn. 925, 933 A.2d 725 (2007). The defendant challenges only the causation element, which required the state to prove that the defendant's conduct was the proximate cause of the victim's death. See *State* v. *Anderson*, 158 Conn. App. 315, 349, 118 A.3d 728, cert. granted, 319 Conn. 908, 123 A.3d 437 (2015) (appeal withdrawn May 4, 2016), and cert. granted, 319 Conn. 907, 123 A.3d 438 (2015) (appeal withdrawn May 5, 2016). "Proximate cause in

the criminal law does not necessarily mean the last act of cause, or the act in point of time nearest to death. The concept of proximate cause incorporates the notion that an accused may be charged with a criminal offense even though his acts were not the immediate cause of death. An act or omission to act is the proximate cause of death when it substantially and materially contributes, in a natural and continuous sequence, unbroken by an efficient, intervening cause, to the resulting death. It is the cause without which the death would not have occurred and the predominating cause, the substantial factor, from which death follows as a natural, direct and immediate consequence." (Emphasis omitted; internal quotation marks omitted.) *State* v. *Richards*, 196 Conn. App. 387, 404, 229 A.3d 1157 (2020), aff'd, 339 Conn. 628, 261 A.3d 1165, cert. denied,    U.S.    , 142 S. Ct. 431, 211 L. Ed. 2d 255 (2021).

In the present case, there was ample evidence to support the jury's finding that the defendant's conduct substantially and materially contributed to the victim's death. With respect to the defendant's conduct, Ouellette and Manuel both testified that the defendant assaulted the victim by putting him in a headlock and threatening him with a knife. Gregory Vincent, the associate medical examiner who conducted the autopsy of the victim, testified that his findings were consistent with the eyewitness testimony that the defendant put the victim in a headlock. Specifically, he testified that the autopsy revealed a dark red hemorrhage on the victim's left neck muscle, which "could indicate an injury . . . [caused by] pressure put on [the victim's] neck either by hands or a ligature . . . ." Moreover, the defendant, who testified on his own behalf, acknowledged that he interacted with the victim "almost every day" and that "everybody knew" that the victim had respiratory issues because "he used to struggle to speak" and "was always looking for air." Despite the defendant's awareness of the victim's respiratory problems, Ouellette testified that the defendant prevented the victim from using his inhaler by knocking

it out of his hand, stomping on it, and then kicking it away while attempting to choke the victim.

As for the causal connection between the defendant's conduct and the victim's death, Ouellette testified that the victim appeared to be acting normally and was not having any difficulty breathing before the altercation with the defendant. Ouellette and Manuel testified that, during the altercation, the victim started grabbing his chest and gasping for air. Laing and Foster testified that the victim was struggling to breathe and unable to respond when they arrived outside to assist and that, by the time they lowered him to the ground to render first aid, the victim was unconscious and had no pulse. The jury also heard testimony that the victim was on a ventilator from the time he arrived at the hospital and that he never regained consciousness after the assault. Moreover, Vincent testified to his opinion that the victim's death was caused by "complications following cardiac arrest during [a] physical altercation in a person with hypertensive cardiovascular disease and chronic bronchial asthma." In totality, this evidence was sufficient to support a finding that the defendant's attack on the victim was a proximate cause of the victim's death.

In arguing to the contrary, the defendant relies on the testimony of Kelly Johnson-Arbor, an emergency medicine and toxicology physician, who testified that she could not rule out the possibility that the victim suffered an opioid overdose.[5] The defendant notes that Johnson-Arbor and Vincent both testified that a toxicology screening of the victim completed shortly after he arrived at the hospital was positive for the presence of opiates, an opioid overdose can impair a person's breathing and lead to hypoxia, a condition in which the organs do not receive enough oxygen, and the emergency medical technicians who responded to the incident reported some improvement in the victim's clinical condition after they administered naloxone, which is a drug that counteracts

---

[5] Johnson-Arbor testified as an expert witness for the defense.

the effects of an opioid overdose.[6] The defendant argues that, "given the consistencies in both [Vincent's] and [Johnson-Arbor's] testimony regarding the presence of opiates in [the victim's] system, the jury could not have reasonably excluded that [the victim's] death was a product of his medical ailments and ongoing drug use." We are not persuaded.

First, the defendant overstates the import of Johnson-Arbor's testimony as it pertained to the cause of the victim's death. As the state argues, Johnson-Arbor did not opine that the defendant died as a result of an overdose. On the contrary, Johnson-Arbor testified that she was not opining that Vincent's conclusion regarding the cause of death was incorrect and that, because she is "not a pathologist . . . [she was] not going to opine on [the] cause of death." In fact, Johnson-Arbor clarified that she was not even testifying that the victim suffered an overdose but, rather, only that he had opioids in his system and that, based on the evidence, it is *possible* that he suffered an overdose. She also acknowledged that "there is a difference between saying [the victim] was overdosing and saying [that] an overdose caused his death . . . ."

Second, contrary to the defendant's contention, there was substantial evidence from which the jury could have found that the victim did not suffer an overdose. Laing and Foster, both nurses who administer methadone to treat opioid addition, testified that they did not administer naloxone because the victim did not appear to be suffering from an overdose. Manuel testified that she has witnessed numerous overdoses and that "[i]n no way, shape, or form" was the victim exhibiting any signs of an overdose. Vincent testified that gasping for air, as the victim did after the defendant assaulted him, was not a sign of an opioid overdose. In fact, the defendant himself

---

[6]The evidence presented to the jury indicates that naloxone, commonly known by its brand name Narcan, works by binding more strongly to the opioid receptors in the brain than the opioids themselves, thereby blocking the opioids from binding to those receptors and reversing the depressive effects that opioids have on the respiratory system.

testified that he has family members with asthma and that it appeared to him that the victim was suffering an asthma attack. In addition, Vincent and Johnson-Arbor both testified that naloxone reverses the effectiveness of opioids regardless of whether a person is experiencing an overdose. Thus, the fact that the victim's clinical condition may have improved slightly after the administration of naloxone indicates only that he had used opioids, not necessarily that he suffered an overdose. Consequently, the jury's determination that the victim died as a result of the defendant's attack, rather than as a result of an opioid overdose, was fully supported by the evidence.[7] Accordingly, we conclude that there was sufficient evidence for the jury to find beyond a reasonable doubt that the defendant's conduct was the proximate cause of the victim's death.

II

We next address the defendant's claim that the trial court improperly instructed the jury as to the proximate cause element of manslaughter in the second degree. The defendant argues that the court erred by instructing the jury regarding the victim's preexisting medical condition as it pertained to the issue of whether the defendant's conduct was the proximate cause of the victim's death.

[7]The defendant also takes issue with the fact that Vincent's opinion as to the cause of the victim's death was informed by his review of police reports concerning the eyewitness accounts of the incident. It is well established, however, that a medical examiner properly may rely on information from law enforcement in determining the cause and manner of death. See, e.g., *State* v. *Berrios*, 187 Conn. App. 661, 686, 203 A.3d 571 (trial court properly admitted expert testimony from medical examiner concerning manner of death that was informed by information in police reports), cert. denied, 331 Conn. 917, 204 A.3d 1159 (2019). Additionally, as explained previously, Vincent testified that the autopsy revealed evidence of physical injury to the victim that was consistent with the testimony that the defendant put the victim in a headlock. Moreover, Ouellette and Manuel both provided detailed testimony concerning the defendant's assault of the victim, and the jury was free to consider that testimony in determining whether the totality of the evidence established that the defendant proximately caused the victim's death. Thus, there was considerable evidence to support Vincent's opinion as to the cause of the victim's death.

The state argues that the defendant waived his claim by acquiescing to the court's instruction and, in the alternative, that the court's instruction was proper. We conclude that the defendant did not waive his claim, but we agree with the state that the court properly instructed the jury as to the victim's preexisting medical condition.

The following additional procedural history is relevant to this claim. The trial court provided counsel with draft jury instructions on October 23, 2023, prior to the start of evidence. On the issue of proximate cause, the draft contained instructions regarding the doctrine of intervening cause[8] and regarding the victim's preexisting medical condition. With respect to the latter, the draft instruction stated: "The defendant's criminal liability is not lessened because of a preexisting medical condition of [the victim]. It is sufficient that the defendant's conduct set in motion a chain of events that ultimately produced the death. If the defendant's conduct inflicted upon [the victim] physical or emotional injury or stress or trauma that was in this sense the proximate cause of his death, then the defendant's conduct, under the circumstances, caused the death, even though [the victim] had already been enfeebled by poor physical condition and the physical or emotional stress or trauma were not the only cause of his death. This is so even though it is probable that a person in sound physical condition would not have died

---

[8]"The doctrine of intervening cause . . . refers to a situation in which the defendant's conduct is a but for cause, or cause in fact, of the victim's injury, but nonetheless some other circumstance subsequently occurs—the source of which may be an act of the victim, the act of some other person, or some nonhuman force—that does more than supply a concurring or contributing cause of the injury, but is unforeseeable and sufficiently powerful in its effect that it serves to relieve the defendant of criminal responsibility for his conduct." (Internal quotation marks omitted.) *State* v. *Lawson*, 99 Conn. App. 233, 241, 913 A.2d 494, cert. denied, 282 Conn. 901, 918 A.2d 888 (2007). The doctrine "arises in those cases in which the evidence could support a finding by the jury that the defendant's conduct was overcome by an efficient, intervening cause, or in which the evidence regarding proximate causation was such that, based on the doctrine of efficient, intervening cause, the jury could have a reasonable doubt about the defendant's guilt." (Internal quotation marks omitted.) Id.

from the effects of the defendant's conduct. It does not matter that the defendant's conduct may have only hastened the death, or that [the victim] would have died soon thereafter from another cause or causes. As long as his admittedly and recognizable [preexisting medical condition] was not the only substantial factor in bringing on his death, that condition does not operate to prevent the defendant's responsibility for his conduct having caused [the victim's] death. If the defendant's unlawful conduct set in motion factors that led to [the victim's] death, such conduct establishes the defendant's guilt even though his conduct or the factors he set in motion were not the only cause of [the victim's] death."

The court held a charging conference on October 27, 2023, after the defendant rested his case. When discussing the draft instructions with respect to proximate cause, defense counsel objected to the intervening cause instruction, which included the following sentence: "The defendant claims that his conduct was not the proximate cause of [the victim's] death because there was an intervening cause that was the cause of the death." Defense counsel argued that, because "it's the [defendant's] position that the defendant did not commit a robbery or commit a physical assault on the victim . . . [the intervening cause instruction] would confuse the jury in evaluating the testimony in this case." The court responded that, because "the jury has been presented with evidence throughout the trial about [the victim's] medical conditions . . . I believe I need some type of instruction on how to consider that evidence in the context of the causal elements of the crime." Defense counsel then requested that the court include "a sentence which states [that] the defendant is not claiming an intervening cause. The defendant's claim is that he did not commit the crimes." The prosecutor requested that, in light of the defendant's position that he was not claiming an intervening cause, the court "not include the intervening cause section but leave in the preexisting medical condition section." The court agreed with the prosecutor's request, stating: "[I]f [the defendant]

is not raising [the intervening cause doctrine], I'm not going to confuse the jury with it."

The court then asked if either party wanted to be heard with respect to the instruction regarding the victim's preexisting medical condition. The following colloquy ensued:

"[The Prosecutor]: I'd like that to be kept in because . . . there's evidence of the fact that [the victim] had a heart condition and a chronic persistent asthma condition. . . . [The] instruction says . . . 'if the decedent had a preexisting medical condition,' meaning a condition before the alleged assault, and there's evidence that he had a chronic persistent condition with asthma and heart disease. So, that would be preexisting so I'm asking that instruction remain.

"[Defense Counsel]: . . . I guess my concern is, would that confuse the jury since . . . yes, the defendant offered testimony that yes, [the victim] did have these health conditions, but he's claiming . . . he did not commit the crime or assault . . .

"[The Prosecutor]: (indiscernible) because he's claiming that doesn't mean the jury has to believe that.

"[Defense Counsel]: Right. Right.

"[The Prosecutor]: So, you can still claim it and we should—

"[Defense Counsel]: So, how about adding a sentence that the [defendant's] . . . position is that he did not cause (indiscernible)—

"[The Prosecutor]: I would object to that, Your Honor.

"The Court: What was . . . it that you wanted? . . .

"[Defense Counsel]: The defendant's claim is that he did not . . . assault, or he did not—

"The Court: He did not assault the [victim]?

"[Defense Counsel]: Yes.

"[The Prosecutor]: And where does that fit in on the instructions of the law?

"[Defense Counsel]: Well, he can say—request an instruction he—the defendant's claim is that he did not commit the crimes. How about that?

"[The Prosecutor]: Well, I think . . . the jury knows that by virtue of his not guilty plea and his testimony.

"The Court: Both sides are free to argue that at closing. So, defense counsel will argue strenuously that the defendant did not even assault this [victim]. And then the state can argue whatever they're going to argue.

"I don't want to get into characterizing arguments that counsel may make because they're in a better position to do that . . . than I am as a judge. What I will do is keep this instruction in . . . just this instruction, not the intervening [cause] instruction which I granted defense counsel's motion to remove that. But keep the instruction in about preexisting medical condition so that the jury has some type of framework to understand how, if at all, that issue should be worked into the determination of cause. I won't characterize the arguments; those will be made during closing argument. But I'll leave this part in, noting [the defendant's] request."

The parties presented closing arguments on October 30, 2023. In the state's principal closing argument, the prosecutor explained that the state's theory was that "[the victim] died . . . because he was attacked . . . by the defendant and the stress of the attack and the defendant's prevention of [the victim's] use of the inhaler caused him to not be able to breathe, to go into cardiac arrest, and to have a lack of oxygen to his brain and cause his eventual death." Referencing the preexisting medical condition instruction, the prosecutor noted that the jury would be instructed that if the defendant "inflicted . . . physical or emotional injury or stress or trauma that was in this sense the proximate cause of the death, then the defendant's conduct under the circumstances caused the death even though [the victim] had already been enfeebled by poor

physical condition . . . ." The prosecutor argued that "[t]he state's evidence is that the stress of the attack brought about the respiratory failure and the cardiac arrest which ultimately denied oxygen to [the victim's] brain, causing his death."

Defense counsel argued to the jury that Vincent's testimony regarding the cause of the victim's death was "probably the most bizarre testimony I've ever heard from a medical examiner. . . . And why do I say that? Well . . . we have a middle-aged man, unhealthy. He has a long history of drug addiction, serious heart condition, and asthma. . . . Doctor Vincent tells us the cause of death is complications following cardiac arrest during physical altercation in a person with hypertensive cardiovascular disease and chronic bronchial asthma. . . . [W]hy did he conclude that some[one] died as a result of a homicide . . . who is dead of a heart attack when there is no evidence of any physical injuries?" Subsequently, after noting that "the leading cause of death in the United States is heart disease" and that "over 100,000 Americans die every year of drug overdose," defense counsel argued: "We have an unhealthy man who died possibly of a . . . heart attack brought on by chronic drug abuse and we want to make this a murder case . . . ." Defense counsel further argued that "the state is saying if you have an argument with someone who . . . has a health condition and they have a heart attack, then you can be charged with manslaughter." In rebuttal, the prosecutor urged the jury to "listen carefully" to "the section [of the jury instructions] on the preexisting medical condition" and to find that "[t]he stress of this attack and the robbery caused the death of [the victim]." Thereafter, the court delivered its instructions to the jury, including with respect to the victim's preexisting medical condition in accordance with the draft instructions discussed previously.

## A

As a threshold matter, we address the state's claim that the defendant waived his claim that the court improperly

instructed the jury regarding the victim's preexisting medical condition. In *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), our Supreme Court held that, "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." Id., 482–83. The court further explained that waiver may not "be presumed . . . from defense counsel's mere acquiescence in . . . the jury instructions." Id., 483 n.23. The determination of whether the *Kitchens* waiver rule applies "must be based on a close examination of the record and the particular facts and circumstances of each case." Id., 483.

The state claims that, although defense counsel initially objected to the preexisting medical condition instruction, his subsequent words and conduct amounted to a waiver of that objection. Specifically, the state relies on the fact that, after the prosecutor responded to defense counsel's objection to the preexisting medical condition instruction by arguing that "[just] because [the defendant is] claiming that [he did not assault the victim] doesn't mean the jury has to believe that," defense counsel responded, "[r]ight . . . [r]ight," and then suggested that the court add a sentence to its instruction informing the jury that "[t]he defendant's claim is that he did not . . . assault [the victim] . . . ." According to the state, defense counsel's response to the state's argument manifested an "acknowledg[ment] that [the preexisting medical condition] instruction had a place in the proximate cause charge in the event that the jury did not believe the defendant's testimony that he did not engage in any criminal conduct" and, therefore, constitutes an implicit waiver under *Kitchens*. We disagree.

As explained previously, the *Kitchens* waiver rule applies only when the record indicates that defense counsel "affirmatively accepts the instructions proposed . . . ." *State* v. *Kitchens*, supra, 299 Conn. 483. "[A]ffirmative acceptance mean[s] that counsel would need to express satisfaction with the instruction, not merely acquiesce to it." *State* v. *Johnson*, 316 Conn. 45, 53, 111 A.3d 436 (2015); see also *State* v. *Bellamy*, 323 Conn. 400, 445, 147 A.3d 655 (2016) ("we are not aware of any case in which a reviewing court has construed 'affirmative acceptance' as meaning passive acquiescence"). Here, nothing in the record indicates that defense counsel affirmatively accepted the preexisting medical condition instruction. At the time when defense counsel responded "[r]ight . . . [r]ight" to the state's argument, defense counsel had already explained that he objected to the inclusion of both the intervening cause and the preexisting medical condition instructions because he was concerned that those instructions would confuse the jury in light of the defendant's position that he did not assault the victim. In both instances, after the state responded to defense counsel's objection, defense counsel offered an alternative to address his concern that the instructions would confuse the jury. When he offered that alternative with respect to the intervening cause instruction, the court decided not to give the instruction at all. Under the circumstances, and in light of the back-and-forth nature of a jury charge conference, defense counsel's statement in response to the prosecutor's argument appears to be an acknowledgment of the prosecutor's position, rather than affirmative acceptance of the preexisting medical condition instruction.

Our conclusion is supported by our Supreme Court's decision in *State* v. *Newton*, 330 Conn. 344, 194 A.3d 272 (2018). In that case, the court concluded that the defendant did not implicitly waive his right to challenge a jury instruction when, after the trial court overruled defense counsel's objection to a specific instruction, defense counsel responded " '[a]ll right,' " without expressly taking an exception or submitting a request to charge. See id., 358.

The court determined that "the most reasonable reading of defense counsel's statement is that he was merely acknowledging that the court had heard his position and had ruled against him." Id. As the court explained, "[t]he purpose of the *Kitchens* rule is simply to ensure that defense counsel brings the specific instructional error to the trial court's attention . . . . Nothing in our decision in *Kitchens* requires that, in order to avoid the implicit waiver rule, defense counsel must doggedly and repeatedly pursue an instructional claim that has already been presented to and rejected by the trial court." (Citation omitted; internal quotation marks omitted.) Id., 358–59. In the present case, defense counsel alerted the court to his specific objection by requesting that the court not include the preexisting medical condition instruction, explaining his reasons for that request, and then offering an alternative that would address his concern in the event that the court disagreed with his request to remove the instruction entirely. He was not required to persist in his objection once it became clear that the court had overruled it. Accordingly, we conclude that the defendant did not implicitly waive his objection to that instruction.[9]

B

We turn next to the merits of the defendant's claim that the trial court erred by instructing the jury regarding the victim's preexisting medical condition. "The standard of review for an improper instruction on an element of an offense is whether it is reasonably possible that the jury was misled. . . . In determining whether it was indeed reasonably possible that the jury was misled by the trial court's instructions, the charge to the

---

[9]The state also claims that the defendant "induced the alleged error by requesting that the court omit the intervening cause instruction and thus cannot be heard to complain of its removal on appeal." The defendant, however, does not claim that the court erred by failing to instruct the jury as to intervening cause. Rather, he claims that the court erred by instructing the jury as to the victim's preexisting medical condition. Thus, the defendant did not induce the alleged error that he challenges on appeal.

jury is not to be critically dissected for the purpose of discovering possible inaccuracies of statement, but it is to be considered rather as to its probable effect upon the jury in guiding them to a correct verdict in the case. . . . The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result. . . . The charge must be considered from the standpoint of its effect on the jury in guiding them to a proper verdict. . . . While the instructions need not be exhaustive, perfect or technically accurate, they must be correct in law, adapted to the issues and sufficient for the guidance of the jury." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *State* v. *Flowers*, 69 Conn. App. 57, 70–71, 797 A.2d 1122, cert. denied, 260 Conn. 929, 798 A.2d 972 (2002).

In the present case, the court's instruction regarding the victim's preexisting medical condition was an accurate statement of the law that was properly tailored to the issues in the case. As the prosecutor explained to the jury during closing argument, the state's theory of the case was that "the stress of the [defendant's] attack [on the victim] brought about the respiratory failure and the cardiac arrest which ultimately denied oxygen to his brain causing his death." Throughout the trial, multiple witnesses testified regarding the victim's medical issues, which included heart disease and chronic asthma. Although the defendant testified that he did not assault the victim at all, defense counsel expressly and repeatedly raised the victim's poor health during closing argument, arguing that the victim "died . . . of . . . a heart attack brought on by chronic drug abuse" and urging the jury to reject Vincent's testimony as to the cause of death because "there is no evidence of any physical injuries."

"The primary purpose of a [jury] charge is to assist the jury in applying the law correctly to the facts that it has found proven and to call the attention of the members of

the jury, unfamiliar with legal distinctions, to whatever is necessary and proper to guide them to a correct decision in the case." *State* v. *Hannon*, 56 Conn. App. 581, 590–91, 745 A.2d 194 (2000), cert. denied, 274 Conn. 911, 876 A.2d 1203 (2005). Here, the state's theory of the case and defense counsel's closing argument naturally raised the possibility that, in the absence of some instruction from the court, the jury incorrectly might believe that, if it found that the victim's medical conditions contributed to his death, it could not find the defendant guilty even if the defendant's assault on the victim was the triggering event leading to his death. As the trial court properly recognized in overruling defense counsel's objection to the preexisting medical condition instruction, the jury needed "some type of framework to understand how, if at all, that issue should be worked into the determination of cause."

The defendant does not argue that the language of the preexisting medical condition instruction that the court provided to the jury was an inaccurate statement of the law. Rather, he contends that the instruction is "tethered to the intervening cause analysis" and only applies if the defendant "seek[s] to relieve criminal liability by claiming an intervening cause." We disagree.

As an initial matter, the defendant's contention that he did not seek to use the victim's medical condition as an intervening cause is not entirely accurate. Although defense counsel's principal theory of defense was that the defendant did not assault the victim, his closing argument focused heavily on the victim's poor health and drug use, and he expressly argued that the victim "died . . . of . . . a heart attack brought on by chronic drug abuse . . . ." Although it was not couched in the language of intervening cause, this argument plainly sought to use the victim's medical conditions to raise reasonable doubt as to whether the defendant caused the victim's death.

Moreover, the defendant does not cite a single case that supports his argument that it is improper for the court to instruct the jury regarding a victim's preexisting

medical condition unless the defendant expressly claims that the victim's condition was an intervening cause. The defendant instead relies on a footnote in the Judicial Branch model criminal jury instructions regarding a victim's preexisting medical condition, which states: "Use if the defendant is claiming that a pre-existing medical condition of the decedent was an intervening cause." Connecticut Criminal Jury Instructions 2.6-1 n.4, available at http://www.jud.ct.gov/JI/Criminal/Criminal.pdf (last visited June 26, 2026). It is well established, however, that the model jury instructions "are intended as a guide only" and "[are] not binding on this court." (Internal quotation marks omitted.) *State* v. *Ortiz*, 343 Conn. 566, 599, 275 A.3d 578 (2022). Moreover, the model instructions do not indicate that the preexisting medical condition instruction should be used *only* if the defendant claims that the victim's condition was an intervening cause. This is significant because, in the very same section of the model instructions, a different footnote recommends that a different portion of the model proximate cause instruction should be "[u]se[d] *only* when the defendant may have intended one type of harm but caused another." (Emphasis added.) Connecticut Criminal Jury Instructions, supra, instruction 2.6-1 n.2. The inclusion of such language demonstrates that the authors of the model instructions knew how to limit the circumstances under which an instruction should be given. The absence of such language in the same section of the model instructions on which the defendant relies therefore constitutes strong evidence that the footnote accompanying the preexisting medical condition instruction should not be read to limit its application to only those instances in which a defendant claims that a victim's medical condition was an intervening cause. Thus, there is no support for the defendant's contention that the court was precluded from instructing the jury regarding the victim's preexisting medical condition merely because the defendant did not expressly claim that the victim's condition was an intervening cause. Accordingly, we conclude that the court did not err in

instructing the jury regarding the victim's preexisting medical condition.

The judgment is affirmed.

In this opinion the other judges concurred.